UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

ROY DEAN HUMPHREY and )
DEBORAH KAY HUMPHREY, )
 )
       Plaintiffs, )
 )
  v. ) No. 2:04 CV 72 DDN
 )
UNITED STATES OF AMERICA, )
 )
       Defendant. )

**MEMORANDUM OPINION**

This action was tried to the court sitting without a jury. The parties consented to the exercise of plenary authority by the undersigned Magistrate Judge under 28 U.S.C. § 636(c). The parties filed post-trial memoranda.

Plaintiffs Roy Dean Humphrey and his wife Deborah Kay Humphrey brought this negligence action against the defendant United States for monetary damages under the Federal Tort Claims Act, 28 U.S.C. § 2674. The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1346(b)(1) and 2671.

From the evidence adduced at trial the court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(c).

**DISCUSSION**

On December 3, 2002, the automobile driven by plaintiff Roy Dean Humphrey was struck head-on by the federal government vehicle driven by Kenneth H. Foit, an employee of the United States Department of the Interior. At the time of the collision Foit was operating his vehicle within the scope of his federal agency employment. Foit momentarily nodded off while driving, his vehicle crossed over the center line of Highway 63 in Adair County, Missouri, and struck Humphrey's vehicle head-on. Plaintiff Humphrey suffered substantial injuries in the

collision.[1]  Defendant has admitted that it is liable for the plaintiffs' damages and has made no allegation that Humphrey was contributorily at fault in the collision.  The contested issues are the extent of Roy Dean Humphrey's injuries and the amounts of damages to which he and his wife are entitled.

In an action under the Federal Tort Claims Act, claims are governed by the law of the jurisdiction where the claim arose.  28 U.S.C. § 1346(b)(1).  Under the law of Missouri, plaintiffs are entitled to be fairly and reasonably compensated for the injuries that were proximately caused by the vehicular collision of December 3, 2002.  <u>Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc./Special Products, Inc.</u>, 700 S.W.2d 426, 431 (Mo. 1985)(en banc); <u>Sampson v. Missouri Pacific Ry. Co.</u>, 560 S.W.2d 573, 588-89 (Mo. 1978)(en banc).

### **Injuries Suffered by Roy Dean Humphrey in the Collision**

Shortly after the collision, emergency rescue personnel required approximately 20 minutes to extricate Mr. Humphrey from the wreckage of his automobile.  He was immediately transported by ambulance to Northeast Regional Medical Center in Kirksville.  Later that day, he was flown by helicopter to the University of Missouri Medical Center in Columbia, because of the severity of his injuries.

In the collision Mr. Humphrey suffered many life threatening physical injuries.  At the scene of the accident, he moved in and out of consciousness.

Mr. Humphrey suffered significant traumatic physical brain injury, with bilateral bleeding into brain tissue.  CT scans of his brain revealed bleeding and swelling in several locations.  A CT scan in January 2003 revealed an area of hypodensity near the basal ganglia (an area responsible for certain motor functions), indicating that some of the tissue in that area had died.

---

[1]Plaintiff Deborah Kay Humphrey was not with her husband in the automobile, but the government does not dispute that she suffered compensable damages.

Also, Mr. Humphrey suffered comminuted fractures to the right acetabulum[2], and his chest was crushed resulting in the fracture of several ribs and abdominal injuries including lacerations of several internal organs.

The comminuted fractures to the right acetabulum involved Mr. Humphrey's right hip socket being broken into many small pieces as a result of Mr. Humphrey's right femur being driven back by the force of the collision. Mr. Humphrey's hip was surgically reconstructed with the use of screws and plates.

As a result of the hip socket injury, Mr. Humphrey suffered damage to his sciatic nerve, leaving his right leg paralyzed from the knee down. He suffers foot drop, which makes it impossible for him to walk normally without an orthotic (brace) on his leg and foot. Moreover, as a consequence of the paralysis in his right leg, the muscles of Mr. Humphrey's right lower leg have atrophied, withered, and been replaced with fibrous tissue. His toes have "clawed" or turned under.

Mr. Humphrey's surgically reconstructed hip is at risk for degeneration. This will require at least one surgery for a total hip replacement in the reasonably foreseeable future. Further, Mr. Humphrey's awkward gait puts unnatural stress on his right knee which accelerates the degeneration of the knee joint. Consequently, to a reasonable degree of certainty he will require a total right knee replacement.

The crushing injury to Mr. Humphrey's chest caused a collapse of his pulmonary system. He required a tracheotomy and breathing with a ventilator for three months. Mr. Humphrey had to be weaned off the ventilator at a facility that specializes in such treatment in St. Louis. In this process, he developed an infection and had to be returned to the University of Missouri Medical Center.

---

[2]The acetabulum is the cup-shaped depression in the outside surface of the hip bone in which the head of the femur fits. Stedman's Medical Dictionary at 11 (25th ed.)

During his hospitalizations, Mr. Humphrey developed cardiomyopathy[3] and a congestive heart condition as a consequence of his injuries. While these conditions were arrested by medication, Mr. Humphrey continues to suffer diminished heart functioning as a result of the collision.

Mr. Humphrey also suffered lacerations to his liver and kidneys and his spleen ruptured. He underwent surgery to repair the lacerations to his liver and kidneys and to remove his spleen. The injuries to his kidneys caused renal failure. As a result, toxins ordinarily filtered from the blood by the kidneys began to rise in Mr. Humphrey's blood. In the days following the collision, the presence of these toxins also further compounded his brain injuries, potentially causing encephalopathy, a deterioration of the brain tissue.

Following the collision on December 3, 2002, Mr. Humphrey was hospitalized in intensive care for approximately three months.

### The Humphreys' Life Before and After the Collision

Before the December 3, 2002 collision, Mr. Humphrey was a vigorous and active person, fully employed and fully engaged in the activities of life. Prior to the collision, Mr. and Mrs. Humphrey enjoyed a happy marriage together and regularly engaged in marital relations. Since the collision, their lives and their marital relationship have changed.

Before December 3, 2002, Mr. Humphrey had been steadily employed for eleven years at Ortech in Kirksville, Missouri. He worked on the factory line assembling car parts. He earned $10.10 per hour and worked 40 hours per week. He received benefits including medical insurance, life insurance, and a 401K retirement plan.

Prior to the collision, Mrs. Humphrey worked full time as a Licensed Practical Nurse at Northeast Regional Medical Center in Kirksville. She earned $13.72 per hour, excluding benefits, and worked a 36 hour week. As a result of the December 3, 2002, collision Mrs.

---

[3]Cardiomyopathy is a type of progressive heart disease where the heart is abnormally enlarged, thickened, and stiffened. The heart's ability to pump blood is weakened. www.WebMD.com/content/pages/9/1675_57821.htm.

Humphrey lost four months from work. She stayed with her husband day and night during his hospitalizations, sleeping on the floor or in a chair.

Mr. and Mrs. Humphrey have four children. On December 3, 2002, two of the children were grown and living on their own. The Humphreys' youngest daughter, Nikole, was then 13 years old and living at home. Along with their daughter, the Humphreys were then raising their biological grandson, Trevor, whom they had adopted. Trevor was three years old at the time of the collision.

Before December 3, 2002, Mr. Humphrey performed the ordinary household chores in maintaining a house and raising a family. He maintained a large garden that provided produce for the family. He had a passion for automobiles and rebuilt automobile engines, and he enjoyed the outdoors and hunting trips.

Following the collision, Mr. Humphrey was unable to see his children for many weeks, and the Humphreys missed spending Christmas 2002 with their children.

After she and her husband returned home in April 2002, Mrs. Humphrey returned to part-time work. This enabled her to assist her husband in his recovery, to administer his medications, and to take him to his therapy and many doctors' appointments. Eventually, she moved to an "as-needed" nursing position which paid a greater hourly wage, but had no benefits.

Before the collision, Mr. Humphrey was known as a friendly, easygoing man who genuinely enjoyed the company of others. As a result of the collision, he is limited by his physical, mental, and psychological impairments. His foot drop condition makes it difficult for him to walk without his orthotic without falling, especially in the bathroom. Mr. Humphrey walks with an awkward and unnatural gait, and cannot stand for extended periods of time.

As a result of the collision, Mr. Humphrey's mood and personality have changed. He was depressed and lethargic after returning home from his hospitalizations, hardly moving from his bed. He currently suffers bouts of depression for which he takes medication. Further, contrary to his personality before the collision, Mr. Humphrey avoids people and

is easily irritated by social situations and the noise associated with groups of people. Due to his frustration and his limited cognitive functioning, he frequently becomes short-tempered and angry with his family, whereas before the collision he routinely showed them affection.

As a result of the collision, Mr. Humphrey suffered a diminution of his mental ability. During the hospitalization, he was confused much of the time and often did not recognize his family. His verbal IQ went from 94 (indicating the low end of average) to 83. His performance IQ went from 94 to 72. After the collision his overall IQ tested at 77 (borderline retarded).

Mr. Humphrey is no longer able to complete simple domestic tasks without supervision or assistance. For instance, when preparing meals, he leaves food items out when they should be returned to the refrigerator. He is also unable to make the simple repairs around the house that he once did routinely because he no longer can follow through on the task. Now, Mr. Humphrey must enlist help to complete those tasks. Mr. Humphrey has difficulty concentrating, and rambles in conversation. While his long-term memory is intact, his attention span is limited and his short-term memory is impaired. He now needs supervision in the administration of his required medications, to be sure he takes them properly.

Mr. Humphrey has been unable to return to the activities he enjoyed prior to his injuries, such as gardening and working on automobiles.

### Post-Hospitalization Condition

Mr. Humphrey has full ranges of motion in and use of both arms and hands. He can sit for up to two and one half hours. His left leg and foot are not limited in any way.

Before the collision, Mr. Humphrey did not suffer from any sexual dysfunction. As a result of the collision, while he has normal sexual desire, he cannot successfully engage in sexual intercourse with his wife. This sexual dysfunction is a permanent condition, possibly attributable to injury to the pudendal plexus nerve caused by the fractured acetabulum and the efforts to repair it. No surgery can

remedy this condition, although prescribed medication may have some positive effect on his sexual abilities. It is reasonable for Mr. Humphrey to consider receiving a penile implant in an effort to regain his ability to have sexual intercourse with his wife and to regain his earlier sexual relationship with her.

Mr. Humphrey suffered from Type II diabetes before the December 3, 2002, collision, and continues to suffer from it, well controlled by medication. His diabetic condition has not substantially affected his post-collision medical condition.

As a result of the collision, he suffers from depression for which he will require prescribed medication and counseling for the rest of his life.

Further, as a result of the collision, Mr. Humphrey was diagnosed with sleep apnea, an inability to breathe properly while sleeping. Sleep apnea is a life threatening condition if not properly treated. As a result, Mr. Humphrey now requires a C-PAP machine that supplies him with a continuous supply of air to breathe as he sleeps.

Given the injuries suffered in the collision, and the resulting effects upon plaintiff's physical, mental, and emotional condition, Mr. Humphrey is not capable of engaging in gainful employment. Had he not been injured in the collision, he would have worked until age 73.

### **Future Care and Treatment**

Mr. Humphrey is required to take a variety of prescription medications as a consequence of the December 2002 accident. The purposes of the medications range from simple pain management to communicable disease prevention incidental to the removal of Mr. Humphrey's spleen. The regular costs that Mr. Humphrey will incur to obtain these vital treatments are an essential component of the damages suffered by Mr. Humphrey.

As a result of the collision, Mr. Humphrey's injuries to his right hip were extensive and will require a total hip replacement at some point in the future. Consequently, the cost of a future hip replacement is an essential part of Mr. Humphrey's economic damages attributable to

the December 3, 2002 collision.  The estimated future cost for a single future hip replacement, $50,000.00, is fair and reasonable.

Mr. Humphrey will require an orthotic brace to control his foot drop condition for the rest of his life; this brace will need to be regularly serviced and occasionally replaced.  The reasonable cost of that future expense is estimated to be $451.33 per year for a single, boot-type brace that Mr. Humphrey would have to use for all occasions.

Mr. Humphrey's awkward walking gait puts unusual stress on his right knee which to a reasonable degree of certainty will require a total right knee replacement.  This cost is reasonably estimated to be $50,000.00.

An award of damages to Mr. Humphrey for future medical care will include the cost of treatment for his sexual dysfunction.  This treatment can be either prescription medications for life or surgery for a penile implant.

For the sleep apnea condition, the cost of the C-PAP device and its maintenance are reasonably necessary.  This expense includes the cost of the machine, estimated to be $1,500 for the machine, plus $600 per year for periodic replacement and supplies.

Because of the intracranial bleeding and other injuries Mr. Humphrey experienced in the collision, he is reasonably expected to need occasional pain management because of the dysthymic pain he will suffer.

### Mr. Humphrey's Mental Condition

Mr. Humphrey suffered serious neuropsychological impairment as a result of his injuries sustained in the collision of December 3, 2002. His cognitive abilities, previously in the average range, are now in the borderline retarded range.  He has suffered a serious intellectual decline from the brain injury he received in the accident which limits his cognitive abilities and makes it difficult and risky for him to stay alone for long periods of time and impossible for him to return to the competitive workforce.

The injuries Mr. Humphrey sustained profoundly changed his emotional outlook on life and his general disposition.  Mr. Humphrey's personality prior to the accident was easygoing and gregarious.  As a

result of the collision, he is moody, anxious, and prone to emotional outbursts. These changes in his mood and personality are the result of major depressive disorder brought on by his difficulty adjusting to his injuries and new role in his family. The treatment of Mr. Humphrey for his cognitive impairment and depression is reasonably necessary.

### Mr. Humphrey's Life Care Plan

Given the severity of Mr. Humphrey's physical limitations and the fact that he cannot care for himself independently, the life care plan must make funds available for his necessary in-patient treatment to adjust to life after a traumatic brain injury, future surgical needs, ongoing prescription medication treatment, routine examinations by the various medical specialists, renovations to Mr. Humphrey's house, and potential in-home care. The injuries suffered by Mr. Humphrey have compromised Mr. Humphrey's heart functioning, have weakened his immune system, have increased the chances that he will suffer from dementia in his later years, and put him on a path to further orthopedic degeneration.

## DAMAGES

### Roy Dean Humphrey's Past and Future Economic Damages

Mr. Humphrey's past economic financial losses total $115,000 through the date of this memorandum opinion.

Mr. Humphrey's past medical bills total $689,386.

Mr. Humphrey is unable to work and his permanent physical and cognitive disabilities will prevent him from returning to gainful employment. He would have earned future wages and benefits of $750,000.

### Deborah Kay Humphrey's Past and Future Economic Damages

Mrs. Humphrey is a Licensed Practical Nurse who worked full time with benefits before this accident. As previously indicated, Mrs. Humphrey lost income immediately after this accident and began working part time after Mr. Humphrey was able to be left alone for periods of time. Subsequently, she began working as an on-call nurse. While that position paid more hourly than her full time nursing position, she does

not have to work as many hours to replace her income.  On the other hand, she was forced to give up the benefits of full time employment, including paid vacation, medical insurance, guaranteed hours, and the potential for advancement.  Although Mrs. Humphrey has been able to replace the majority of her income, she has not been able to replace all of it, nor has she been able to replace her benefits and she is entitled to reimbursement for those amounts.  In addition, as she has not been able to obtain full time employment since the accident, she is entitled to reimbursement for the difference in what she is likely to earn and what she would have been receiving but for the accident.

Following the December 3, 2002 collision and injuries to her husband, Mrs. Humphrey would have worked to age 73 and has lost and will lose total wages and benefits of $400,000.00.

### Roy Dean Humphrey's Life Care Plan of Future Care and Treatment

The next step in determining Mr. Humphrey's damages is determining the costs of Mr. Humphrey's future care, medical costs, and treatment.  Considering all the evidence and the arguments of counsel, the court assesses damages in the sum of $1,250,000.00 for future care and treatment.

### Roy Dean Humphrey's Non-economic Damages

Pain and Suffering:  Mr. Humphrey has endured severe pain and suffering from the date of the collision and will suffer pain and suffering for which the court assesses damages in the amount of $1,000,000.

Loss of Ability to Enjoy Life:  Mr. Humphrey has suffered significant loss of his ability to enjoy life as a result of the collision and will suffer significant loss of his ability to enjoy life in the future, for which the court assesses total damages in the amount of $1,000,000.

Disfigurement:  Mr. Humphrey has been severely disfigured by his injuries, including the foot drop which makes him walk with a noticeable gait, and the subsequent surgeries necessary to save his life and repair his body.  Mr. Humphrey's awkward gait and foot drop brace clearly

identify him as a person who has suffered horrifying injuries. Mr. Humphrey has suffered damages for disfigurement from the date of the collision and will suffer damages for disfigurement in the future for which the court assesses damages in the amount of $1,000,000.

### **Deborah Kay Humphrey's Non-economic Damages**

Plaintiff Deborah Kay Humphrey has been married to plaintiff Roy Dean Humphrey for approximately 28 years. Under Missouri law, a loss of consortium claim arises in a wife when her husband is injured by another and she suffers damages through the loss of the society and companionship of her husband and economic losses based on expenses incurred in caring for her husband. <u>Novak v. Kansas City Transit, Inc.</u>, 365 S.W.2d 539, 543-44 (Mo. banc 1963).

Loss of Consortium: The injuries to Mr. Humphrey have deprived Mrs. Humphrey of the services her husband once performed in the domestic household. Further, Mr. Humphrey is limited in the society and companionship he provided to his wife before December 3, 2002. Finally, Mr. and Mrs. Humphrey are unable to engage in marital relations as they did regularly in the past.

For the loss of consortium Mrs. Humphrey has suffered from the date of the collision and will suffer in the future, the court assesses her damages in the amount of $500,000.

Judgment is entered herewith accordingly.

/s/ David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 30, 2006.